FILED

2021 Aug-26  PM 02:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION**

| | | |
|---|---|---|
| **MELANIE TOLBERT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 4:18-CV-00680-KOB** |
| | ) | |
| | ) | |
| **DISCOVERY, INC. a/k/a DISCOVERY** | ) | |
| **COMMUNICATIONS, LLC f/k/a** | ) | |
| **SCRIPPS NETWORK INTERACTIVE,** | ) | |
| **INC., a/k/a SCRIPPS NETWORKS, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION</u>

In 1887, American playwright and novelist Constance Cary Harrison wrote in her book *Bar Harbor Days*, "Our boys say you are a copy cat, if you write in anything that's already been printed."[1] That line is one of the first known uses of the phrase "copycat," now a derogatory colloquialism for those who imitate others' ideas instead of coming up with their own.

In the present case, Plaintiff Melanie Tolbert—an actress, writer, and singer who has from time to time worked as Angelina Jolie's stunt double—brings a copyright infringement claim against Defendant Discovery, Inc. Ms. Tolbert claims that Discovery, through cable television channel HGTV, copied her idea for a mother-daughter home renovation show.[2] Copyright infringement claims are difficult to prove; as explained below, Ms. Tolbert must show *factual* copying—i.e., that Discovery had access to her work and that Ms. Tolbert's work and Discovery's allegedly infringing work are substantially similar—as well as *actionable* copying—

---

[1]     Brahna Siegelberg, <u>What a Copycat</u>, Slate (Aug. 12, 2011, 3:55 p.m.), https://slate.com/news-and-politics/2011/08/copycat-where-does-the-term-come-from.html.

[2]     Discovery acquired Scripps Network Interactive—the former owner of cable television channel HGTV—on March 6, 2018, after the events in this action occurred. Discovery is now the owner of HGTV.

i.e., that the elements of Ms. Tolbert's work that Discovery allegedly copied are protected expression.

In 2014, Ms. Tolbert moved from Los Angeles to Gadsden, Alabama, to be closer to her mother. She hatched the idea for a mother-daughter home renovation show she called *Like Mother, Like Daughter*; made a teaser for it; and sent the teaser out to various producers working in the home renovation television industry in July 2014.

Three years later, in August or September 2017, Ms. Tolbert came across HGTV's *Good Bones*, a home renovation show starring Indianapolis-based mother-daughter duo Karen Laine and Mina Starsiak. Ms. Tolbert then copyrighted her teaser video for *Like Mother, Like Daughter* and brought this action against Discovery and production company High Noon, alleging that they infringed upon her work. The court dismissed High Noon from this case for lack of personal jurisdiction on November 25, 2019. (Doc. 57). Ms. Tolbert subsequently brought suit against High Noon in the United States District Court for the District of Colorado—as further discussed below.

This matter is now before the court on several motions: (1) Defendant Discovery's motion for summary judgment (doc. 113); (2) Plaintiff Melanie Tolbert's motion to exclude the testimony of Discovery's expert Lars Schou (doc. 134); and (3) Defendant Discovery's motion to strike portions of Melanie Tolbert's declaration offered as summary judgment evidence (doc. 137). All motions have been fully briefed.

For the reasons explained below, the court DENIES Ms. Tolbert's motion to exclude the testimony of Discovery's expert Lars Schou (doc. 134), GRANTS IN PART and DENIES IN PART Discovery's motion to strike portions of Ms. Tolbert's declaration (doc. 137), and GRANTS Discovery's motion for summary judgment as to Plaintiff's copyright infringement

claim, the only remaining claim in this case (doc. 113). The court will first provide a brief overview of the related Colorado action, then address the evidentiary motions, and move on to Discovery's motion for summary judgment.

## I.     The Colorado Action

After this court dismissed production company High Noon as a defendant for lack of personal jurisdiction, Ms. Tolbert brought suit against High Noon in the United States District Court of Colorado. *See Tolbert v. High Noon Productions, LLC*, No. 1:20-cv-01734-DDD-NYW, 2021 WL 2661649, at *1 (D. Colo. June 29, 2021). On June 29, 2021, Defendant Discovery provided this court with notice of the Colorado district court's Order and Final Judgment. (Docs. 156, 156-1, 156-2).

Like the case before this court, only one claim remained in the Colorado case against High Noon: Ms. Tolbert's claim for copyright infringement. The Colorado court granted High Noon's motion for summary judgment as to Ms. Tolbert's copyright infringement claim, finding that "Ms. Tolbert adduced no evidence that any employee or representative of High Noon had a reasonable opportunity to view or otherwise access her teaser for *Like Mother[,] Like Daughter* until she filed [the] suit." *Tolbert*, 2021 WL 2661649, at *4. The Colorado court granted High Noon's motion for summary judgment on that basis alone; it did not consider whether Ms. Tolbert's teaser and *Good Bones* are substantially similar or whether High Noon independently created *Good Bones*. (*Id.* at *5). In its notice, Discovery asserts that its "summary judgment motion relies upon the same factual record and legal arguments" as High Noon's did. (Doc. 156 at 2).

On July 9, 2021, Ms. Tolbert filed with this court a notice of her appeal of the Colorado court's decision. (Doc. 157 at 2). She asserts that the Colorado court's ruling "does not speak to

the issue of Discovery's access to Plaintiff's work" and "does not provide a basis to rule in favor of Discovery in its pending dispositive motion." (*Id.*).

The court has reviewed the order, final judgment, and briefs in the Colorado case. The court is not bound by the Colorado court's decision, but it notes the similarity of the issues and the persuasiveness of its ruling, while recognizing that Discovery is not High Noon.

## II.   Ms. Tolbert's Motion to Exclude Discovery Expert Lars Schou's Testimony (Doc. 134)

Ms. Tolbert moves the court to exclude or limit the testimony of Defendant Discovery's designated rebuttal forensic expert, Lars Schou. (Doc. 134). Ms. Tolbert did not designate any expert witnesses by the expert disclosure deadline of August 31, 2020. But on March 10, 2021, the court granted Ms. Tolbert leave to designate electronic forensic experts to offer opinions on allegedly falsified emails between employees at High Noon Entertainment, Discovery, and Scripps Networks that Discovery produced as evidence in support of its motion for summary judgment to show that *Good Bones* was developed independently from and prior in time to *Like Mother, Like Daughter*. (Doc. 123). On March 16, 2021, the court granted Discovery leave to disclose rebuttal experts on the forensic issues. (Doc. 128).

Ms. Tolbert designated David A. Land and John R. Troxel as her electronic forensic experts. Both opine that emails Discovery submitted as evidence "are not true and authentic copies of email correspondence." (Doc. 134 at 2). Discovery designated Lars Schou as its rebuttal forensic expert witness. Mr. Schou is a senior forensic consultant at Epiq, a company that provides technology-enabled legal services, including eDiscovery services. (Doc. 134-2). Mr. Schou's resume states that he has 20 years of experience in IT, eDiscovery, and computer forensics and has a "deep understanding of a number of industry standard tools such as . . . AXIOM." (*Id.*). Ms. Tolbert moves to exclude Mr. Schou's testimony under Fed. R. Evid. 702,

401, 402, and 403; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 526 U.S. 579 (1993); and

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

Under Fed. R. Evid. 702,

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert*, the Supreme Court established that under Rule 702, a "trial judge must ensure that all scientific testimony or evidence admitted is not only relevant but reliable." 509 U.S. at 589. The *Daubert* standard is "a flexible one"; the court's focus "must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 594–95. *Daubert*'s "gatekeeping" principles apply to all expert testimony, not only scientific testimony." *Kumho Tire*, 526 U.S. at 147.

The judge's role is not to determine the persuasiveness of an expert's opinion; that task belongs to the jury. The Supreme Court has instructed that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

The Eleventh Circuit has set forth three factors for district courts to use when determining whether expert testimony is admissible under *Daubert*. *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 562 (11th Cir. 1998). District courts must consider whether

> (1) the expert is qualified to testify competently regarding the matters he intends to address;

(2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and

(3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Id.*

In other words, expert testimony is admissible if the expert is qualified, the methodology is reliable, and the testimony would be helpful.

Ms. Tolbert argues that Mr. Schou's "opinion and basis for his opinion fails to meet the standards of Fed. R. Evid. 702 and its judicial interpretations." (Doc. 134 at 3). Because Ms. Tolbert has challenged Mr. Schou's testimony, the burden shifts to Discovery to show that Mr. Schou's testimony satisfies the requirements for admissibility by preponderance of the evidence. The court will consider below whether Mr. Schou is qualified, whether his methodology is reliable, and whether his testimony is relevant. As discussed below, the court finds that Mr. Schou's testimony is admissible and thus DENIES Ms. Tolbert's motion to exclude Mr. Schou's testimony (doc. 134).

A. Qualifications

Ms. Tolbert asserts that Mr. Shou is not qualified by knowledge, skill, experience, training, or education in electronic forensics. (Doc. 134 at 11). In response, Discovery describes Mr. Schou's qualifications. (Doc. 149). Discovery asserts that Mr. Schou possesses over 20 years of IT experience and that he has worked in the field of digital forensics for over a decade. (*Id.* at 10). According to Discovery, Mr. Schou has performed "th[e] exact type of analysis [he performed in this case] on hundreds of computer systems and media" and that any challenges to his qualifications go to the weight and not the admissibility of his testimony. (*Id.*).

Based upon its review of Mr. Schou's resume and his report, the court finds that Mr. Schou is qualified to provide testimony as a rebuttal to Ms. Tolbert's experts' testimony on

whether the emails Discovery submitted as summary judgment evidence were altered based upon his knowledge, skills, experience, and training. He has extensive experience in computer forensics and regularly conducts analysis for digital forensics investigations. Any challenges to his qualifications go to the weight of his testimony and not to its admissibility.

      B.  <u>Reliability</u>

Ms. Tolbert asserts that Mr. Schou did not "employ any articulated or discernable theory or methodology in reaching his offered conclusions." (Doc. 134 at 4). Ms. Tolbert asserts that Mr. Schou failed to disclose any training or expertise in the tools he used—Google Vault, Magnet AXIOM, and Gmail MIME Boundary Decoder—to examine the subject emails and that he did not state who obtained the subject emails. (*Id.*). Ms. Tolbert states that Discovery offered no chain of custody to show that Mr. Schou examined genuine email files. (*Id.* at 5). Ms. Tolbert also asserts that Mr. Schou relied upon native emails found in High Noon's Google Vault that were only available to Discovery. (*Id.* at 8).

As to the latter contention, Discovery states in response that High Noon produced native emails from the Google Vault to Ms. Tolbert on March 1 and 2, 2021 and then again with Mr. Schou's report. (Doc. 149 at 2). Discovery submits the Declaration of Michael Beylkin, counsel for High Noon Productions in the Colorado litigation, along with email correspondence showing Mr. Beylkin delivered the native files to High Noon. (Doc. 149-1). Discovery asserts that Ms. Tolbert "continues to base theories upon [the] irregularities in the PDF copies of the emails despite receiving corroborating native copies that **<u>irrefutably</u>** show that Plaintiff's effort to call into question these documents is misguided." (Doc. 149 at 3) (emphasis in original).

Discovery asserts that Mr. Schou used reliable industry-standard programs and that he "applied that technology to a reliable analytical methodology in arriving at his conclusions."

(Doc. 149 at 12). Mr. Schou concludes that the opinions Ms. Tolbert's experts proffer—that the emails Discovery offered as summary judgment evidence were altered—are inconsistent with the native email data he pulled and reviewed. (Docs. 149 at 9; 149-2).

The court finds that Discovery has met its burden to show that Mr. Schou's testimony is sufficiently reliable. Mr. Schou has extensive experience in computer forensics, and he used industry-standard programs to extract and analyze the emails. Any challenges to his methodology go to the weight of the evidence.

C.   Relevance

Ms. Tolbert argues that Mr. Schou's opinions are not relevant because instead of opining on the authenticity of the emails, Mr. Schou "exclusively offers opinions regarding the characteristics and nature of purported 'native' email files contained within High Noon's Google Vault," to which Ms. Tolbert and her experts did not have access. (Doc. 134 at 11). The court found above that Discovery offered evidence showing that although Ms. Tolbert may not have had access to High Noon's Google Vault, an e-discovery tool, Discovery produced the native emails pulled from the Google Vault to Ms. Tolbert in March 2021. The court finds that Mr. Schou's testimony is relevant and helpful to the extent that Discovery uses it to rebut the conclusions of Ms. Tolbert's experts offering opinions on the emails; the probative value of Mr. Schou's testimony is not substantially outweighed by the factors set out in Fed. R. Evid. 403— "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

Because the court finds that Mr. Schou is qualified, his methodology is reliable, and his testimony is relevant, the court DENIES Ms. Tolbert's motion to exclude the expert testimony of Lars Schou (doc. 134). The court thus considers Mr. Schou's testimony in its review of the

summary judgment evidence to the extent that it is relevant to the issues before this court. But below, in its discussion of independent creation, the court determines that the emails are only additional evidence supporting uncontradicted declarations Discovery submitted as summary judgment evidence.

### III.     Discovery's Motion to Strike Portions of Ms. Tolbert's Declaration (Doc. 137)

Discovery moves to strike portions of Ms. Tolbert's declaration (doc. 126-11), which she offers as summary judgment evidence. (Doc. 137). Discovery asks the court to strike portions of the declaration pursuant to Fed. R. Civ. P. 56 and Fed. R. Evid. 701 and 702. (*Id.* at 1). Discovery asserts that Ms. Tolbert's declaration is "rife with unfounded allegations and improper expert testimony masquerading as lay opinion testimony" and that Ms. Tolbert lacks foundation for several statements. (*Id.* at 2).

In response, Ms. Tolbert argues that Discovery's motion to strike her declaration is "an improper means of attempting to challenge [Ms. Tolbert's] offered evidence in this matter" because a motion to strike evidence is not contemplated by the Federal Rules of Civil Procedure. (Doc. 152 at 3). In reply, Discovery states that a party may move to strike an affidavit that does not conform to Fed. R. Civ. P. 56(e). (Doc. 155 at 2).

This court has not infrequently considered motions to strike affidavits or declarations alongside summary judgment submissions. Although a motion to strike a declaration or affidavit may not be explicitly contemplated by the Federal Rules of Civil Procedure, Rule 56(c)(4) provides that an affidavit or declaration submitted as summary judgment evidence "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Thus, the fact that Discovery brought a motion to strike rather than objecting to the evidence in another manner is

of no consequence. In fact, Ms. Tolbert herself has previously brought motions to strike declarations in this case. (*See* Docs. 44, 45).

As referenced, a declaration or affidavit must be based upon personal knowledge. Fed. R. Civ. P. 56(c)(4). Federal Rule of Evidence 602 provides that "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Federal Rule of Evidence 701 provides that for lay witness testimony, an opinion must be "(a) rationally based on the perception of the witness, (b) helpful to clearly understanding the witness's testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

Personal knowledge is "[k]nowledge gained through firsthand observation or experience, as distinguished from a belief based on what someone else has said." *Batres-Garay v. U.S. Attorney General*, 748 Fed. App'x 204, 208–209 (11th Cir. 2018) (quoting *Personal Knowledge, Black's Law Dictionary* 951 (9th ed. 2004)). To have personal knowledge of an industry practice, a witness must have extensive experience in the field. *See Great American Ins. Co. v. Jefferson County Comm'n*, 776 F. Supp. 2d 1252, 1260 (N.D. Ala. 2010) (finding that witness's "twenty-five years of insurance experience provide[d] an adequate basis for discussing standard industry practices").

A.  Paragraph 9

In paragraph 9 of her declaration, Ms. Tolbert lists 21 producers in the home renovation television genre to whom she pitched her teaser in either July 2014 or October 2014. Ms. Tolbert asserts each has a "direct tie[] to HGTV/Discovery" and that most "also worked with defense witness Lindsey Weidhorn and Defendant High Noon." (Doc. 126-11 at 5).

Discovery asserts that Ms. Tolbert lacks a foundation to aver in paragraph 9 of her

declaration that certain individuals and entities are affiliated with HGTV and Discovery. Discovery states that Ms. Tolbert "does not establish in her declaration any way that she could possibly have personal knowledge of these statements she makes in paragraph 9" and that paragraph 9 is thus due to be stricken. (Doc. 137 at 3).

In response, Ms. Tolbert states that she has a foundation to allege that certain individuals were Discovery-related, as she obtained information about the producers to whom she pitched her teaser from the International Movie Data Base (IMDB). (Doc. 152 at 8). She lists various links to IMDB.

In reply, Discovery states that even though Ms. Tolbert has listed various website links, she has not "laid the proper predicate to show that she herself had personal, first-hand knowledge of these producers' ties to Discovery." (Doc. 155 at 4).

The court finds that Ms. Tolbert lacks personal knowledge that the named producers had ties to Discovery. The court GRANTS Discovery's motion to strike paragraph 9 IN PART and DENIES it IN PART. The court strikes Ms. Tolbert's statement that she pitched to producers "with direct ties to HGTV/Discovery" and all the descriptive information she has listed next to each producer's name. The court also strikes Ms. Tolbert's statement that "[a]ll the producers that I pitched to had worked with HGTV/Discovery, with most having also worked with defense witness Lindsey Weidhorn and Defendant High Noon," as she has offered no foundation for that statement. But the court does not strike Ms. Tolbert's identification by name of the producers to whom she pitched her teaser, as she has personal knowledge as to those to whom she emailed the teaser.

B.  Expert Testimony and Industry Practice

Discovery asserts that Ms. Tolbert's declaration is "rife with expert opinion on the

'entertainment industry standard practice'" but that Ms. Tolbert was not disclosed as an expert.

(Doc. 137 at 4). Discovery submits that Ms. Tolbert offers expert testimony in the following

paragraphs or parts of paragraphs in her declaration:

- Paragraph 1: "Based on my knowledge and experience, I can testify that the entertainment industry standard practice for production of a television show involves casting, table reads, several call backs and in person screen tests. In every situation the production company and network want to meet their stars in person before investing massive finances and time into the enormous ordeal of shooting a pilot or moving forward with a television series."
- Paragraph 2: entire paragraph
- Paragraph 11: entire paragraph
- Paragraph 12: entire paragraph
- Paragraph 13: entire paragraph
- Paragraph 14: entire paragraph
- Paragraph 15: entire paragraph
- Paragraph 16: entire paragraph
- Paragraph 17: entire paragraph
- Paragraph 19: entire paragraph
- Paragraph 20: entire paragraph
- Paragraph 22: entire paragraph

Discovery asserts that some of Ms. Tolbert's testimony mirrors expert testimony on

substantial similarity submitted in the Colorado action that was not submitted in this case

because Ms. Tolbert did not timely designate experts. (*Id.* at 6).

Discovery also asserts that Ms. Tolbert's testimony on industry practices is not based on

her personal knowledge and that Ms. Tolbert offers no foundation for such testimony. (*Id.* at 7).

Discovery states that Ms. Tolbert has not established that she has produced a home improvement

reality TV show nor that any of her experience relates to the home improvement reality TV

genre. (*Id.* at 9).

In response, Ms. Tolbert states that her declaration is "offered solely in her capacity as a fact witness" and is "made upon her personal knowledge, sets out facts that would be admissible in evidence, and demonstrates that [she] is competent to testify on the matters attested to." (Doc. 152 at 5). Ms. Tolbert says that her "collective education, work history, and professional credits in the entertainment industry" give her a basis for offering this testimony. (*Id.*). Ms. Tolbert states that the fact that her testimony mirrors that of an expert in the Colorado proceedings "does not serve to discount or invalidate the admissibility of [her] declaration." (*Id.* at 15). In support of her response, Ms. Tolbert offers a declaration saying that she has "written and created seventeen entertainment intellectual properties (IPs) (nine TV and film productions [and] eight music videos)." (Doc. 152-2 at 2).

In reply, Discovery reiterates that Ms. Tolbert must have first-hand knowledge of the subject about which she is testifying and that as a non-expert, she may not proffer testimony on the timeline of a show in which she was not involved. (Doc. 155 at 6).

The court has reviewed Ms. Tolbert's declaration (doc. 126-11) and finds that Ms. Tolbert has not shown that most of her commentary on "standard industry practice" is based upon personal knowledge. Although Ms. Tolbert has produced some of her own music videos and shorts and has interacted with production crews as an actress, she has not worked on the production side of a home renovation or reality television show to have acquired knowledge and experience as to industry standards employed by production companies working in that genre. The court STRIKES the following paragraphs or parts of paragraphs of Ms. Tolbert's declaration:

- Paragraph 1: The court finds that Ms. Tolbert's statement that "[i]n every situation the production company and network want to meet their stars in person before investing massive finances and time into the enormous ordeal of shooting a

pilot or moving forward with a television series" is not based upon personal knowledge.

- Paragraph 11: Full paragraph. The court finds that Ms. Tolbert's commentary on pitching novel television concepts is not based upon personal knowledge.
- Paragraph 13: The court finds that Ms. Tolbert's statement starting with "The industry practice" and ending with "shooting the pilot episode" is not based upon personal knowledge.
- Paragraph 14: Full paragraph. The court finds that Ms. Tolbert's commentary on the production process is not based upon personal knowledge.
- Paragraph 15: The court finds that Ms. Tolbert's statement starting with "Production companies" and ending with "create the production" is not based upon personal knowledge.
- Paragraph 16: Full paragraph. The court finds that Ms. Tolbert's commentary on television production is not based upon personal knowledge.
- Paragraph 17: The court finds that Ms. Tolbert's statement starting with "Based on my experience" and ending with "except mine" is not based upon personal knowledge.
- Paragraph 19: Full paragraph. The court finds that Ms. Tolbert's commentary on "substantial similarity" is not based upon personal knowledge and does not constitute proper lay witness opinion testimony.
- Paragraph 20: Full paragraph. The court finds that Ms. Tolbert's commentary on "substantial similarity" is not based upon personal knowledge and does not constitute proper lay witness opinion testimony.
- Paragraph 22: Full paragraph. The court finds that Ms. Tolbert's commentary on Defendant's timeline is not based upon personal knowledge and does not constitute proper lay witness opinion testimony.

But the court declines to strike the following paragraphs of Ms. Tolbert's declaration:

- Paragraph 1: "Based on my knowledge and experience, I can testify that the entertainment industry standard practice for production of a television show involves casting, table reads, several call backs and in person screen tests." Before making this statement, Ms. Tolbert sets out her experience with auditions, call backs, and screen tests.
- Paragraph 2: The court finds that Ms. Tolbert's commentary on the difficulty of the auditioning process is based upon personal knowledge.
- Paragraph 12: The court finds that Ms. Tolbert's commentary on not hearing of a television show falling into place or a pilot being approved for production based upon raw video footage is based upon personal knowledge.
- Paragraph 13: The court finds that Ms. Tolbert's statement that "In my years of casting and getting booked for on camera roles, I have never gotten, even the smallest of on camera roles, without meeting the production executives in person, usually several times" is based upon personal knowledge.
- Paragraph 15: The court finds that Ms. Tolbert's statement that "I have never seen or heard of a teaser or sizzle video used to green light a TV series pilot and shoot the pilot as Defendants claim" is based upon personal knowledge.

- Paragraph 17: The court finds that Ms. Tolbert's statement starting with "I understand Defendants" and ending with "calling contractors" is based upon personal knowledge.

The court thus GRANTS IN PART and DENIES IN PART Discovery's motion to strike Ms. Tolbert's declaration (doc. 137). The court has considered the portions of Ms. Tolbert's declaration that it has not stricken in its review of the summary judgment evidence.

## IV.    Discovery's Motion for Summary Judgment

Now that the court has ruled upon the evidentiary challenges, the court will consider Discovery's motion for summary judgment (doc. 113). Ms. Tolbert filed a response (doc. 126), and Discovery filed a reply (doc. 136). Because Discovery submitted new evidence with its reply brief, the court granted Ms. Tolbert leave to file a surreply (doc. 141). (Doc. 151).

### A.  Standard of Review

Under Federal Rule of Civil Procedure 56(a), a court may grant summary judgment on a claim or defense when the moving party establishes that (1) no genuine disputes of material fact exist, and (2) the moving party is entitled to judgment as a matter of law.

The moving party bears the initial burden of "informing the district court of the basis of its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56).

The burden then shifts to the non-moving party to show "a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether a jury could reasonably return a verdict for the non-moving party

based on the evidence the nonmoving party presented. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). The court must also view the evidence in the record in the light most favorable to the non-moving party, drawing reasonable inferences in the non-moving party's favor. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015). Inferences can create genuine issues of material fact. *Carlson v. FedEx Ground Package Sys., Inc.*, 787 F.3d 1313, 1318 (11th Cir. 2015). But "[a] mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice; there must be enough of a showing that the jury would reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

In considering the evidence, the court may not make credibility determinations or weigh the evidence, both of which are "jury functions." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) (quoting *Liberty Lobby, Inc.*, 477 U.S. at 255) (internal quotations omitted).

B.  Facts and Background

According to Discovery, the undisputed facts are as follows. High Noon is a television production company that produces reality television shows, such as the home renovation show *Fixer Upper*, which aired on HGTV. (Docs. 114 at ¶ 3; 115-1, Neff. Decl. at ¶¶ 3–5; 115-3, Sayles Decl. at ¶¶ 4–5). In late 2013, High Noon was looking to develop a new show in the same genre as *Fixer Upper*. (Docs. 114 at ¶ 4; 115-1, Neff. Decl. at ¶¶ 6–7; 115-2, Seiler Decl. at ¶ 7). In November 2013, Tina Seiler, a casting producer for High Noon, was looking for new talent with a family dynamic different from the husband-and-wife team featured on *Fixer Upper* and the two-brother team featured on *Property Brothers*. (Docs. 114 at ¶ 10; 115-1, Neff. Decl. at ¶¶ 7–8; 115-2, Seiler Decl. at ¶¶ 7–8). Through a Google search, Ms. Seiler found the Facebook page for the Indianapolis-based home renovation company Two Chicks and a Hammer, run by

16

mother-daughter team Karen Laine and Mina Starsiak. (Docs. 114 at ¶ 11; 115-1, Neff Decl. at ¶¶ 7–8; 115-2, Seiler Decl. at ¶¶ 7–8).

Ms. Seiler initially emailed Ms. Starsiak on November 12, 2013 and then telephoned her and continued to email her about High Noon's interest in developing a mother-daughter home-renovation show. (Docs. 114 at ¶ 12; 115-1, Seiler Decl. at ¶¶ 8–10 & Exs. A–B). Ms. Seiler sent Ms. Laine and Ms. Starsiak digital flip-cameras to video their work and interactions so that they could create a "sizzle reel"—a kind of promotional video used in the entertainment industry. (Docs. 114 at ¶¶ 13, 15; 115-2, Seiler Decl. at ¶ 11–13; 115-1, Neff Decl. at ¶ 8). Ms. Seiler also video interviewed Ms. Laine and Ms. Starsiak for the sizzle reel. (Docs. 114 at ¶ 16; 115-1, Seiler Decl. at ¶ 12).

By the end of February 2014, High Noon had completed a rough cut of the sizzle reel—including video footage Ms. Starsiak and Ms. Laine shot on the flip cameras, footage Ms. Starsiak and Ms. Laine posted on their Two Chicks and a Hammer Facebook page, and the interviews Ms. Seiler had recorded—to pitch to television networks. (Docs. 114 at ¶¶ 17–18; 115-1, Neff Decl. at ¶¶ 9-12 & Exs. A-J; 115-2, Seiler Decl. at ¶¶ 14-16 & Exs. C-G). Discovery avers that Ms. Neff told Lindsey Weidhorn, Director of Programming and Development at Scripps (the former owner of HGTV) about the show. (Docs. 114 at ¶ 18; 115-1, Neff Decl. at ¶12; 115-4, Weidhorn Decl. at ¶ 6). On March 7, 2014, High Noon pitched *Two Chicks and a Hammer* to Ms. Weidhorn, using the sizzle reel. (Docs. 114 at ¶ 19; 115-1, Neff Decl. at ¶¶ 13-16 & Exs. K-M; 115-2, Seiler Decl. at ¶ 16; 115-4, Weidhorn Decl. at ¶¶ 7-8). On April 4, 2014, HGTV greenlit *Two Chicks and a Hammer* and ordered production of a pilot episode. (Docs. 114 at ¶ 20; 115-1, Neff Decl. at ¶¶ 13-16 & Exs. K–M; 115-2. Seiler Decl. at ¶16; 115-4, Weidhorn Decl. at ¶¶ 7-8). From that time until May 2015, High Noon worked "on the creative elements of

the pilot episode"; taped, produced, and edited the pilot episode; negotiated contracts with Ms. Starsiak and Ms. Laine's contracts; and helped them find homes to flip for the show. (Docs. 114 at ¶ 21–22; 115-1, Neff Decl. at ¶¶ 18, 20; 115-3, Sayles Decl. at ¶¶ 8-9; 115-4, Weidhorn Decl. at ¶9).

In July 2014, Plaintiff Melanie Tolbert created a teaser video for her concept of a mother-daughter home renovation show, *Like Mother, Like Daughter*. (Docs. 114 at ¶ 27; 115-5, Kaufmann Decl., Ex. C).

On May 4, 2015, HGTV broadcast *Two Chicks and a Hammer*. (Docs. 114 at ¶ 23; 115-1, Neff Decl. at ¶ 20; 115-4, Weidhorn Decl. at ¶ 14). On May 27, 2015, HGTV ordered a 10-episode television series based upon the success of the pilot. (Docs. 114 ¶ at 24; 115-1, Neff Decl. at ¶ 21; 115-4, Weidhorn Decl. at ¶ 14). HGTV changed the name of the show to *Good Bones* before the first season began airing on March 22, 2016. (Docs. 114 at ¶ 25; 115-1, Neff Decl. at ¶ 21; 115-4, Weidhorn Decl. at ¶ 14).

Discovery avers that no one at Discovery saw Ms. Tolbert's teaser until after Ms. Tolbert filed a case against Discovery in May 2018. (Docs. 114 at ¶ 31; 43-2, Rosado Decl. at ¶¶ 4-6; 115-4, Weidhorn Decl. at ¶¶ 16-17). Discovery avers that no one at High Noon received any communication from Ms. Tolbert until September 19, 2017, and that no one at High Noon saw Ms. Tolbert's teaser until Ms. Tolbert filed her case against High Noon in June 2020. (Docs. 114 at ¶¶ 29–30; 115-1, Neff Decl. at ¶ 23; 115-2, Seiler Decl. at ¶ 20; 115-3, Sayles Decl. at ¶ 11). Discovery avers that it searched for emails from Ms. Tolbert in its email system and found none. (Docs. 114 at ¶ 32; 43-2, Rosado Decl. at ¶ 5).

Lastly, Discovery avers that Ms. Tolbert's work consists of stock elements and clichés—

including scenes depicting the stars of a home renovation series sitting or standing separately or together in a house under renovation, showing the stars promoting the title of their series, depicting them entering a bathroom decorated with flowers, portraying them celebrating a success with a high five, taping them in scenes with cute dogs (or cats), showing them at a table looking at design plans, filming them in front of a wall that is being repaired, and showing them adding or retaining an original design feature of a home as a finishing touch to a completed remodel.

(Docs. 114 at ¶ 34; 115-5, Kaufmann Decl., Ex. C; 115-3, Sayles Decl. at ¶ 12; 115-1, Neff Decl. at ¶ 25).

Ms. Tolbert disputes most of the facts Discovery avers, e.g. that it did not see her teaser and that High Noon independently created *Good Bones*. She bases many of her factual disputes on her theory that Discovery edited emails it offers as summary judgment evidence. (Doc. 126 at 6–7). But she agrees that *Fixer Upper* features a husband-and-wife renovation team and that *Property Brothers* stars a two-brother team. (Doc. 126 at ¶ 12). She agrees that the pilot episode of *Two Chicks and a Hammer* was broadcast on HGTV on May 4, 2015, and again on May 10, 2015. (*Id.* at ¶ 15). She agrees that the series name was changed to *Good Bones* before the first season of the series aired on March 22, 2016, and she agrees that she created her teaser video in July 2014. (*Id.* at ¶ 12).

C.  Discussion

Discovery argues that it is entitled to summary judgment because the undisputed facts show that it did not have access to Ms. Tolbert's teaser, because *Good Bones* is not "substantially similar" to any copyright-protected expression contained in Ms. Tolbert's teaser, and because *Good Bones* was created independently and prior in time to Ms. Tolbert's teaser. (Doc. 113). Ms. Tolbert contends that "genuine issues of fact exist on all elements of [her] claim." (Doc. 126 at 8). The court will consider each issue in turn—access, substantial similarity, and independent creation.

Under 17 U.S.C. § 102, "original works of authorship" are provided copyright protection. But protection does not extend to *ideas*, only to "tangible medium[s] of expression.' *Id.* For a copyright infringement claim, a plaintiff "must prove '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1541 (11th Cir. 1996) (quoting *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)). Discovery concedes that Ms. Tolbert holds a valid copyright; thus Ms. Tolbert must prove only the second element—copying of original elements.

Copying itself is divided into two subparts—factual copying and actionable copying. *Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1301 (11th Cir. 2020). A plaintiff may show factual copying by either "direct evidence or . . . indirect evidence demonstrating that the defendant had *access* to the copyrighted work and that there are *probative similarities* between the allegedly infringing work and the copyrighted work." *MiTek Holdings, Inc. v. Arce Engineering Co., Inc.*, 89 F.3d 1548, 1554 (11th Cir. 1996) (emphasis added). Probative similarities are also known as "substantial similarities."

"To determine whether an allegedly infringing work is substantially similar to a copyrighted work, [the court] ask[s] whether 'an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work.'" *Baby Buddies, Inc. v. Toys R Us, Inc.*, 611 F.3d 1308, 1315 (11th Cir. 2010) (citing *Oravec v. Sunny Isles Luxury Ventures, L.C.*, 527 F.3d 1218, 1223 (11th Cir. 2008)). If a plaintiff is unable to show access, she may still succeed on a copyright infringement claim if she can show that the works are "'*strikingly* similar." *Herzog v. Castle Rock Entertainment*, 193 F.3d 1241, 1248 (11th Cir. 1999) (quoting *Ferguson v. National Broadcasting Co.*, 584 F.2d 111, 113 (5th Cir. 1978)) (emphasis added).

Actionable copying exists when the elements of a copyrighted work that were copied "are protected expression and of such importance to the copied work that the appropriation is actionable." *Peter Letterese & Assocs. v. World Inst. of Scientology Enters.*, 533 F.2d 1287, 1300 (11th Cir. 2008). "[T]he issue of infringement is intertwined with the issue of determining which parts of the work are actually protected by the copyright—once the court separates out the protectable elements of a work, it can become clear that no reasonable jury could find the defendant's work infringing." *Baby Buddies,* 611 F.3d at 1314 (citations omitted). Copyright protection "extends only to the particular expression of an idea and never to the idea itself." *Herzog*, 193 F.3d at 1248 (citation and internal quotations omitted). Scenes-à-faire—i.e. "incidents, characters, or settings that are indispensable or standard in the treatment of a given topic"—are not protectable. *Id.* But "a work may be protected by copyright law when its otherwise unprotectable elements are arranged in a unique way." *Corwin v. Walt Disney*, 475 F.3d 1239, 1251 (11th Cir. 2007).

"[P]roof of access and substantial similarity raise[] only a presumption of copying." *Original Appalachian Artworks, Inc. v. Toy Loft*, 684 F.2d 821, 829 (11th Cir. 1982). If a defendant produces evidence that it independently created a work, it "can negate the presumption of copying." *Watt v. Butler*, 457 Fed. App'x 856, 859 (11th Cir. 2012).

1. *Access*

Discovery argues that it did not have access to Ms. Tolbert's *Like Mother, Like Daughter* teaser and that Ms. Tolbert's theory that it did "is speculation stacked upon conjecture." (Doc. 114 at 17). Under Eleventh Circuit law, access is defined as a "reasonable opportunity to view." *Ferguson v. National Broadcasting Co.*, 584 F.2d 111, 113 (1978). "[M]ere speculation and

conjecture" are not enough; the plaintiff must show "a reasonable possibility that the defendant came across the plaintiff's work." *Watt*, 457 Fed. App'x at 859 (11th Cir. 2012).

Access may be established through a third party, but "[t]he mere fact that a third party knew the [allegedly infringing party] and had worked with the [allegedly infringing] defendant in the past, as well as any inference that fails to reasonably establish actual contact between the third party and the [allegedly infringing] defendant with respect to the particular work in question, is insufficient." William F. Patry, Patry on Copyright § 9:29 (2021).

Discovery argues that the actual evidence shows that "no one at High Noon or Discovery who worked on the concept, development, or production of *Good Bones* **ever** received or viewed [Ms. Tolbert's] teaser before this litigation was filed." (Doc. 114 at 17) (emphasis in original). Discovery points to affidavits from High Noon employees Katie Neff, the Senior Vice President of Development at High Noon Productions, who was responsible for producing the sizzle reel for *Two Chicks and a Hammer* (which would become *Good Bones*) and who was also responsible for pitching it; Tina Seiler, former casting producer at High Noon Productions who Discovery contends discovered the show's stars; and Glenna Stacer Sayles, an executive producer at High Noon Productions who produced the pilot episode of *Two Chicks and a Hammer/Good Bones*. Ms. Neff, Ms. Seiler, and Ms. Sayles testify that they did not receive or watch Ms. Tolbert's teaser before the litigation of this case; that the teaser played no role in the creation, development, or production of *Good Bones*; and that they searched their communications, including emails, and found no communications from Ms. Tolbert "or concerning her or any content created by her." (Docs. 115-1, Neff Decl. at ¶ 23; 115-2, Seiler Decl. at ¶ 20; 115-3, Sayles Decl. at ¶ 11).

Discovery also points to affidavits from Elias Rosado, Director of Ediscovery and Digital Forensics at Discovery, and Lindsey Weidhorn, a former Programming and Development executive at Scripps (which was acquired by Discovery) who was responsible for HGTV content. Mr. Rosado testified that Ms. Tolbert did not direct any of her emails to "any email address associated with Discovery, Inc. or any of its subsidiaries" and that based upon his investigation and information, Discovery did not receive any of Ms. Tolbert's emails through a third party. (Doc. 43-2, Rosado Decl. at ¶¶ 5, 10). Ms. Weidhorn testified that she never saw Ms. Tolbert's teaser and that she could not find any emails from Ms. Tolbert. (Doc. 115-4, Weidhorn Decl. at ¶¶ 16–17). Discovery asserts that Ms. Tolbert "has presented no evidence to support the conclusion any individual who received her [t]easer actually provided it to High Noon or Discovery." (Doc. 114 at 20).

In her response, Ms. Tolbert states that she has submitted evidence showing that Discovery had access to her work. (Doc. 126 at 10). Ms. Tolbert asserts that she shared her teaser with producers who had "undeniable business ties with Discovery" and that "it is standard practice in the television entertainment industry for producers, casting directors, and other persons to share among themselves clips, videos, and information about show ideas that have been pitched to them." (*Id.* at 11). According to Ms. Tolbert, "[i]t defies industry practice and is incredulous to believe that after she pitched her show concept to at least 21 producers with ties to HGTV and a division of HGTV that no one at HGTV/Discovery was provided with Plaintiff's expression of concept." (Doc. 126 at 15).

Ms. Tolbert points to email communications with Renovation Realities (doc. 126-3) and Our House Media (doc. 126-4), as well as her own declaration (doc. 126-11) in which she lists producers to whom she sent her teaser in July and October 2014, to show that Discovery had

access to it. The court found above that Ms. Tolbert lacks personal knowledge as to these producers' alleged ties to Discovery and struck the parts of paragraph 9 of her declaration in which she set out the producers' alleged ties.

In reply, Discovery argues that Ms. Tolbert's evidence constitutes only speculation and conjecture and offers additional declarations as record evidence. (Doc. 136 at 2). Discovery asserts that Ms. Tolbert submits her own declaration to show that Renovation Realities and HGTV are subsidiaries of Discovery, but that she has no personal knowledge as to these statements. (*Id.* at 3). Discovery points to a declaration from its corporate secretary, Tara Smith, stating that HGTV is <u>not</u> a legal entity and that *Renovation Realities* is <u>not</u> a Discovery subsidiary, as well as testimony that *Renovation Realities* was produced by an independent production company, RIVR Media. (Doc. 122-6, Smith Decl. at ¶¶ 5–7; 136-1, Smith Decl. at ¶¶ 3–6); 43-2, Rosado Decl. at ¶ 9).

Discovery also points to Ms. Tolbert's lack of evidence from any individuals to whom she pitched her teaser stating that they provided Discovery with access to her work. (Doc. 136 at 3–4). Discovery points to a declaration from Hanson Bass—Coordinator, People & Culture Ops, for Discovery, Inc.—stating that he searched Discovery's personnel data base for individuals to whom Ms. Tolbert states she sent her teaser video. (Doc. 136-2; Bass Decl.). Mr. Bass states that he only found one name on Ms. Tolbert's list who would have been an employee at Discovery in July and October 2014—a woman named Sharon Lewis, who was a software engineer, not a producer for HGTV. (*Id.* at ¶ 4). Mr. Bass states that the software engineer is "likely a different person" than the Ms. Lewis to whom Ms. Tolbert sent her teaser. Discovery states that it has produced unrebutted evidence—Mr. Rosado and Ms. Weidhorn's declarations—that it did <u>not</u> have access to Ms. Tolbert's teaser before she filed her lawsuit. (Docs. 43-5; 115-4).

In her surreply, Ms. Tolbert asserts that the producers to whom she sent her teaser video worked for production companies—not for Discovery—but provided her teaser to HGTV or DIY Networks, which now fall under Discovery's control. (Doc. 141 at 3). Ms. Tolbert again lists the producers to whom she pitched her teaser and their credentials, which she says she found by using the paid version of International Movie Data Base, a service that "allows full access to contact information for select entertainment professionals." (Doc. 141 at 4–9). Ms. Tolbert's list of producers in her surreply is not record evidence. The court found above that Ms. Tolbert did not have personal knowledge of the producers' ties to Discovery and struck parts of her declaration; accordingly, the court does not consider the struck statements.

Based upon its review of the admissible evidence on the record, the court finds that Ms. Tolbert has not raised a genuine issue of material fact as to whether Discovery had access to her teaser video for *Like Mother, Like Daughter*. Ms. Tolbert argues that the producers to whom she sent her teaser in July 2014 and October 2014 *could have* provided Discovery with access to it. But the Eleventh Circuit standard requires more than a mere possibility; it requires "a *reasonable possibility* that the defendant came across the plaintiff's work." *Watt*, 457 Fed. App'x at 859 (11th Cir. 2012) (emphasis added). Ms. Tolbert has not presented evidence showing a reasonable possibility.

The court finds the two cases to which Discovery points—the Eleventh Circuit's decision in *Benson v. Coca-Cola Company*, 795 F.2d 973 (11th Cir. 1986) and the Fifth Circuit's decision in *Ferguson v. National Broadcasting Co., Inc.*, 584 F.2d 111 (1978)—instructive. In *Benson*, amateur songwriter John J. Benson appealed from a district court's grant of a directed verdict for Coca-Cola Company. 584 F.2d at 974. Mr. Benson contended that Coca-Cola infringed upon his copyrighted song "Don't Cha Know" by using the same musical tune in its "I'd Like to Buy the

25

World a Coke" advertising jingle. *Id.* In affirming the district court's decision to grant a directed verdict to Coca-Cola, the Eleventh Circuit found that Mr. Benson "produced no evidence that [Coca-Cola's] songwriters visited" any of the places he said he performed "Don't Cha Know" in the early 1960s and that Mr. Benson produced no evidence that any record company had received a copy of "Don't Cha Know" and forwarded it to the record company where one of Coca-Cola's songwriters worked in the 1960s. *Id.* The Eleventh Circuit concluded that Mr. Benson did "not establish a reasonable possibility that [Coca-Cola's] writers had access" Mr. Benson's song. *Id.*

In *Ferguson*, songwriter Wilma Virginia Ferguson appealed from the district court's grant of defendant National Broadcasting Company's summary judgment motion on her copyright infringement claim. 584 F.2d at 112. Ms. Ferguson had composed a song called "Jeannie Michele" and distributed six copies of the composition to potential publishers, each of which were returned to her. *Id.* She recognized some of the measures of her song in a theme song for the 1973 NBC show *A Time to Love*. *Id.* at 113. NBC submitted an affidavit in support of its motion for summary judgment in which John Williams, the composer of the theme song, stated he had never heard of Ms. Ferguson or her song. *Id.* In affirming the district court's summary judgment decision, the Fifth Circuit found Ms. Ferguson had produced no evidence "contradicting Mr. Williams's statements" that he did not copy Ms. Ferguson's song and that to find that Mr. Williams had access, the court would have to assume that a company to which Ms. Ferguson sent a composition had made a copy of it and showed it to Mr. Williams and also that Mr. Williams was lying—an assumption which Ms. Ferguson had given the court no reason to believe. *Id.* The court found that "a finding of access in [the] case would be based on speculation or conjecture." *Id.*

Ms. Tolbert argues that *Benson* and *Ferguson* are distinguishable because they deal with musical compositions and because the cases arose in the 1970s and 1980s—a time when media was not as easily shared as it is today, with electronic storage media and internet communications. (Doc. 126 at 10). Ms. Tolbert also argues that the parties in *Benson* and *Ferguson* did not have business ties like the producers with whom she shared her teaser. *Id.* at 11.

True, media is shared more easily today than in the 1970s and 1980s. Still, Ms. Tolbert has not produced *evidence* that Discovery had a reasonable opportunity to view her teaser. The court struck much of her declaration, as it was not based upon personal knowledge. Ms. Tolbert points to a list of producers who *might* have shared her teaser with Discovery. Ms. Tolbert asks the court to make too many assumptions and has not given the court reason to question the declarations of those involved in the creation and production of *Good Bones*. Speculation and conjecture are not enough, and that is all Ms. Tolbert offers for her theory of Discovery's access to her teaser video. The court thus GRANTS Discovery's motion for summary judgment as to Ms. Tolbert's copyright infringement claim, finding that Discovery did not have access to Ms. Tolbert's teaser. Still, it will consider Discovery's alternative arguments.

2. *Substantial Similarity*

Discovery argues that even if it had access to Ms. Tolbert's teaser, *Good Bones*[3] "is not substantially similar to any copyright-protected expression contained in [Ms. Tolbert's teaser]." (Doc. 114 at 3). Rather, says Discovery, the works "are similar only in their ***general unprotected idea*** (which High Noon created first) of a mother-daughter team engaged in home renovations, and the unprotected stock elements and scènes-à-faire that naturally flow from this idea." (*Id.* at

---

[3]    The court considers the *Two Chicks and a Hammer* sizzle reel, the *Two Chicks and a Hammer/Good Bones* pilot, and episodes from the first season of *Good Bones* in its substantial similarity analysis.

5) (emphasis in original).

Discovery correctly points out that Ms. Tolbert's idea for a mother-daughter home renovation show is an *idea* and thus not subject to copyright protection. (Doc. 114 at 5). Discovery points to HGTV's home renovation shows *Fixer Upper* and *Property Brothers* as having similar stock elements and scènes-à-faire as *Good Bones* and Ms. Tolbert's teaser for *Like Mother, Like Daughter*. (*Id.*).

In determining whether an infringing work is "substantially similar" to a copyrighted work, the court considers the view point of a lay observer and asks if an average person would recognize that the infringing work was copied from the copyrighted work. *Baby Buddies*, 611 F.3d at 1315 (citing *Oravec*, 527 F.3d at 1223). If the average lay observer would find that the infringing work is a copy, the court then considers whether the similarities are protected expression and central to the copied work. *Peter Letterese*, 533 F.2d at 1300. The court has watched Ms. Tolbert's *Like Mother, Like Daughter* teaser as well as the sizzle reel, pilot episode, and much of the first season of *Good Bones* to compare the works in question. (Docs. 115-5, Kaufmann Decl., Ex. C; 115-1, Neff Decl., Exs. L & Q). To determine whether Ms. Tolbert's teaser and the *Two Chicks and a Hammer/Good Bones* sizzle reel, pilot, and show are substantially similar, the court must compare aspects of the works.

Ms. Tolbert argues that the works are substantially similar in a number of ways. She submits a shot-by-shot analysis, which she argues shows similarity in

> blocking; wardrobe; hair; cast/character positioning; body language; same shot framing; setting; mood; tone; show format; and show content including renovation planning, bathroom reveal, insertion [by the mother] of [an] element from original renovation into finished project, two dogs roaming about during renovations, composition of cast interview segments, high five scenes, hand painted show name, and explanation of renovation work by [] daughters to camera.

(Doc. 126 at 18).

Discovery argues that Ms. Tolbert's teaser and *Good Bones* are not substantially similar when the court compares protectable elements such as characters, theme, plot, setting, and pace. (Doc. 114 at 25).

The court has compared the works and finds that many of the similarities to which Ms. Tolbert points are stock elements and scenes-a-faire. The use of loglines—brief text summaries explaining what is happening on the screen—is a stock element of home renovation shows. Many of the other similarities to which Ms. Tolbert points—mothers and daughters sharing banter, characters showcasing a renovated bathroom with flowers on the sink, characters high-fiving, characters looking at the camera and explaining a renovation, characters sitting at a table looking at floor plans, characters repairing sheet rock, dogs roaming around a renovation site, characters wearing black, characters wearing their hair down, and characters' blocking and body language—constitute scenes-à-faire in any home renovation show.

The court will now consider the protectable elements of the works.

a. <u>Characters</u>

Discovery argues that, unlike *Good Bones*, the *Like Mother, Like Daughter* teaser does not develop the show's characters beyond establishing that the home renovation show features a mother and daughter. (Doc. 114 at 25). In contrast, according to Discovery, *Good Bones* develops its characters and offers insight into their backstories.

After scrutinizing the *Like Mother, Like Daughter* teaser, the *Two Chicks and a Hammer* sizzle video, and the *Two Chicks and a Hammer/Good Bones* pilot, the court finds that—other than the fact that a mother and daughter are the main characters of each—the characters of the shows are <u>not</u> similar. Ms. Tolbert's teaser offers no back story on the characters and little character development. Both women outline their renovation skills and experiences, and it

29

appears that Ms. Tolbert and her mother, Janice, have a warm relationship and enjoy working together. Ms. Tolbert talks about her late father's barber shop, and her mother mentions that an item she places in the corner of the bathroom they renovate is from her own mother's home. The characters are otherwise somewhat flat.

In contrast, the *Two Chicks and a Hammer* sizzle reel and *Two Chicks and a Hammer/Good Bones* pilot showcase characters with big personalities. Both Ms. Starsiak and Ms. Laine are bubbly and full of life. In the sizzle video, the viewer learns that Ms. Starsiak buys and sells the homes, takes care of the business's real estate contracts, orders materials, designs floor plans, and is the "big ideas" person in the mother-daughter team. In the pilot, Ms. Starsiak comes off as put together and the woman on the team who runs things.

Ms. Laine, on the other hand, is warm, zany, and the "details person." In the sizzle reel, she shows off a large tattoo on her body. The pilot shows her as someone who loves being the center of attention and who finds a lot of joy in making a house into a home, or as she puts it, making a home go from sad to happy. She is portrayed as a hippie and a flirt. The sizzle reel and pilot also feature Tad, Ms. Starsiak's "goofball" younger brother, demolishing homes and posting his demolitions on the social media application Vine.

Although both shows feature dogs as minor characters and a mother-daughter duo, the court finds that the characters are <u>not</u> substantially similar.

b. <u>Theme/Concept and Hook</u>

Discovery avers that the theme of *Good Bones* is rehabilitation—both of individual homes and of Indianapolis neighborhoods. (Doc. 114 at 25). Discovery points to Ms. Laine saying that "every house has a story and they are helping the house retell its story." (*Id.*).

Ms. Tolbert avers that both shows are "emblematic of the strong, supportive bonds of a mother and daughter" and that both feature a theme of rehabilitation and rejuvenation. (Doc. 126 at 19).

After scrutinizing the *Like Mother, Like Daughter* teaser, the *Two Chicks and a Hammer* sizzle reel, and the *Two Chicks and a Hammer/Good Bones* pilot, the court finds that the themes of the works are <u>not</u> substantially similar. The teaser for *Like Mother, Like Daughter* does <u>not</u> feature a strong theme; Ms. Tolbert says it features a theme of rehabilitation and rejuvenation, but the court finds that attaching such a grandiose theme to a simple bathroom renovation is a stretch.

On the other hand, the sizzle reel and pilot feature footage of Indianapolis and background on the neighborhoods—Fountain Square and Bates Hendricks—that Ms. Starsiak and Ms. Laine are renovating house by house. At the beginning of the pilot episode, the women comment that they buy "rotten, nasty houses" and turn them into "beautiful homes" for their neighbors. The women have a passion for finding diamonds in the rough. A logline in the sizzle reel states that Ms. Starsiak and Ms. Laine are "repairing homes and their relationship." Ms. Laine talks about Ms. Starsiak not speaking to her much her last couple years of high school and how she still sometimes has to apologize for past mistakes. Although their relationship is supportive, it is also complex. The court finds that the themes are <u>not</u> substantially similar.

c. <u>Plot</u>

Discovery avers that the plots of Ms. Tolbert's teaser and of *Good Bones* are not similar. *Like Mother, Like Daughter* features a storyline of cosmetic changes to a small bathroom; *Good Bones* focuses on renovating an entire house from top to bottom and on making a profit from the flip. (Doc. 114 at 26).

After scrutinizing the *Like Mother, Like Daughter* teaser, the *Two Chicks and a Hammer* sizzle video, and the *Two Chicks and a Hammer/Good Bones* pilot, the court finds that the plots of the shows are <u>not</u> substantially similar. The teaser shows cosmetic changes to a bathroom—a transformation from Mickey Mouse décor to more neutral décor—the kind of renovation an average homeowner might do. In contrast, in the sizzle reel and pilot, Ms. Starsiak and Ms. Laine are shown doing major home renovations. For example, in the pilot episode, they flip a house that has been damaged by fire and has a moldy basement. They turn the home's porch into a master suite, add a bathroom upstairs, completely renovate the kitchen, etc. The pilot episode also features graphics that show the amount for which Ms. Starsiak and Ms. Laine buy a home, how much they spend on renovations, the selling price, and their profit margin.

d. <u>Setting</u>

Discovery argues that *Like Mother, Like Daughter* takes place in the bathroom and living room of an unidentified home, while *Good Bones* specifically takes place in Indianapolis. (Doc. 114 at 26). Ms. Tolbert argues that both shows take place in small-to-mid-size towns in middle America, in middle class neighborhoods, and in modest homes. (Doc. 126 at 19). After scrutinizing the *Like Mother, Like Daughter* teaser, the *Two Chicks and a Hammer* sizzle video, and the *Two Chicks and a Hammer/Good Bones* pilot, the court finds that the settings of the shows are <u>not</u> substantially similar.

The *Like Mother, Like Daughter* teaser offers no hints as to where the home in which Ms. Tolbert and her mother are renovating the bathroom is located. In contrast, Indianapolis is a central part of *Good Bones*. The sizzle reel and pilot feature footage of Indianapolis—its skyline, its landmarks, and the neighborhoods in which Ms. Starsiak and Ms. Laine work. Ms. Tolbert's

teaser is limited to the inside of a home; in *Good Bones*, the viewer sees the city and the neighborhood in which Ms. Starsiak and Ms. Laine flip homes.

e. Pace

Discovery states that each *Good Bones* show takes place over the course of several weeks. (Doc. 114 at 26). In each show, Ms. Starsiak and Ms. Laine identify a property, Tad demolishes parts of the property, Ms. Starsiak and Ms. Laine renovate the property, and then they show and sell the property. (*Id.*). In contrast, Discovery argues, Ms. Tolbert and her mother wear the same clothing, and the show likely takes place over the course of a day. (*Id.*). Ms. Tolbert states that "[b]oth shows depict the span of time necessary to conceptualize and complete the home renovation work depicted." (Doc. 126 at 19). After reviewing both the teaser and *Good Bones*, the court finds that the pace of the shows are <u>not</u> substantially similar.

f. Other Claims of Similarity

Ms. Tolbert points out that both her own mother and Ms. Laine add something "that was from the original renovations back into the finished product," but the court finds that this does not show substantial similarity. In *Like Mother, Like Daughter*, Ms. Tolbert's mother states that she has added a porcelain figure from her own mother's house into the corner of the bathroom. In contrast, in *Good Bones*, Ms. Laine takes something from the house that Two Chicks and a Hammer has purchased—for example, a lamp left in the house or a piece of painted wood paneling—and incorporates the item into the final renovation.

Ms. Tolbert also shows stills of the show name painted in her side-by-side comparison. (Doc. 126-9). Ms. Tolbert and her mother paint their shirts with the words "mother" and "daughter"; Ms. Starsiak and Ms. Laine paint "Good Bones" on a window. These stills are similar, but overall, no reasonable factfinder could conclude that *Good Bones* is substantially

similar to the copyrightable elements of *Like Mother, Like Daughter*.

If an allegedly infringing work is not "substantially similar," then it is not "strikingly similar." Thus, the court GRANTS Discovery's motion for summary judgment on the basis that Ms. Tolbert's teaser and Discovery's allegedly infringing work are neither substantially nor strikingly similar.

### 3. Independent Creation

Discovery lastly asserts that High Noon's independent creation of *Good Bones* precludes liability for Discovery. (Doc. 114 at 27). A defendant can negate a copyright infringement claim by showing that it created a work independently. *Calhoun v. Lillenas Publ'g*, 298 F.3d 1228, 1233 (11th Cir. 2002). The court found above that Ms. Tolbert has not raised a genuine issue of material fact as to access and substantial similarity and granted Defendant Discovery's motion for summary judgment on that basis. But the court considers the alternative issue of independent creation as well.

Discovery asserts that "High Noon independently created the underlying concept of what would become the *Good Bones* television show months **before** Plaintiff created and allegedly distributed her Teaser" in July 2014. (Doc. 114 at 27) (emphasis in original). To support its narrative of independent creation, Discovery points to several declarations. First, it points to a declaration from Tina Seiler, casting producer at High Noon, stating she found *Good Bones* stars Mina Starsiak and Karen Laine in November 2013. (Docs. 115-1, Seiler Decl. at ¶¶ 8–11). It points also to declarations from Ms. Starsiak and Ms. Laine stating that they were contacted in November 2013. (Docs. 115-9, Starsiak Decl. at ¶ 6; 115-8, Laine Decl. at ¶ 6).

Discovery also points to a declaration from Katie Neff, who states she produced the sizzle reel for what would become *Good Bones* and pitched it to HGTV by March 2014. (Doc.

115-2, Neff Decl. at ¶¶ 9–13). Ms. Seiler and Ms. Neff also testify that they communicated with Ms. Starsiak and Ms. Laine about the sizzle reel between November 2013 and February 2014. (Docs. 115-1, Seiler Decl. at ¶¶ 11–13; 115-2, Neff Decl. at ¶¶ 8). Ms. Seiler testifies that she sent Ms. Starsiak and Ms. Laine flip-cameras to capture their work and interactions and also conducted video interviews with them. (Doc. 115-1, Seiler Decl. at ¶ 12).

Discovery also points to a declaration from Lindsey Weidhorn. (Doc. 115-4). Ms. Weidhorn testifies that she discussed the concept for a mother-daughter home renovation show with Ms. Neff in February 2014, and that Patrick Jager, then Senior Vice President of Development for High Noon, presented an in-person pitch to her on March 7, 2014. (*Id.*, Weidhorn Decl. at ¶¶ 6–7). Mr. Weidhorn testifies that HGTV ordered a pilot episode of what became *Good Bones* on April 4, 2014. (*Id.* at ¶ 8). Most of the declarations to which Discovery points include email correspondence as exhibits to support the narrative of independent creation to which the witnesses testify.

Discovery argues that the undisputed evidence shows that High Noon came up with "its concept of a self-taught mother-daughter renovation team that remodels dilapidated houses, the spunky daughter that directs construction and design activities with her mother, and a mother-daughter interplay that highlights both mutual love and familial tension" before Ms. Tolbert created her teaser in July 2014. (Doc. 114 at 31).

In response, Ms. Tolbert avers that much of the evidence Discovery offers "is not credible." (Doc. 126 at 8). Ms. Tolbert argues that Discovery offers an inconsistent narrative on the creation of *Good Bones*; that it offers an inconsistent narrative on how High Noon discovered the stars of *Good Bones*; and that the email correspondence it produced as evidence are "inadmissible hearsay and/or not probative/persuasive evidence." (*Id.* at 23–26).

The court first addresses the email issue. Ms. Tolbert argues that the emails Discovery offers as exhibits to its witness declarations in support of its narrative are objectionable, are inadmissible hearsay, and are inauthentic. (Doc. 126 at 26–27). Ms. Tolbert offers reports from two forensic experts—David A. Land and John R. Troxel—saying that the emails Discovery produced were falsified. (Docs. 126-7; 127-8).

In reply, Discovery avers that Ms. Tolbert's expert testimony about the emails does not create an issue of material fact as to the emails' substance "nor does it counter the exhaustive fact testimony from individuals themselves with personal knowledge which demonstrates that *Good Bones* was developed well before Ms. Tolbert created her [teaser]." (*Id.*). Discovery points to the testimony of its own expert, Lars Schou, who found that the emails were not modified and who noted that Ms. Tolbert's experts did not examine the native file formats of the emails— which they produced to her by early March 2021—but instead examined PDF versions. (Doc. 136-8, Schou Decl. at ¶7–8). Like the Colorado court, this court finds that the witness declarations stand on their own merits and that the court need not decide whether the emails constitute inadmissible hearsay or whether they were falsified. *See Tolbert v. High Noon Productions, LLC*, No. 1:20-cv-01734-DDD-NYW, 2021 WL 2661649, at *2 (D. Colo. June 29, 2021). The witnesses set out narratives on the creation of the show in their declarations, and the emails are only additional evidence supporting their declarations; the court relies on the uncontradicted declarations.

The court will now consider the issue of independent creation. Ms. Tolbert argues that Discovery's timeline as to creation and its narrative of discovering the *Good Bones* stars are riddled with inconsistencies.

Ms. Tolbert first points to Ms. Sayles's statement that she was not tasked with producing the pilot episode of *Good Bones* until September 14, 2014—two months after Ms. Tolbert began sending her teaser out to producers. (Doc. 115-3, Sayles Decl. at ¶ 6). Ms. Tolbert also points to Ms. Starsiak and Ms. Laine's declarations, in which they state that they did not complete filming for the pilot until early 2015. (Docs. 115-8, Laine Decl. at ¶ 10; 115-9, Starsiak Decl. at ¶ 10).

Ms. Tolbert argues that it is "highly implausible" that Ms. Starsiak and Ms. Laine captured footage on flip cameras for a sizzle reel; that Ms. Neff created the sizzle reel before meeting Ms. Starsiak and Ms. Laine in person; and that HGTV ordered a pilot without undergoing intermediary steps. (Doc. 126 at 24). Ms. Tolbert argues that Ms. Neff and Ms. Weidhorn say that production of the pilot ran from April 2014 to May 2015 and that this timeline contradicts Ms. Sayles's statement that she was tasked with production of the pilot in September 2014. (*Id.*; Docs. 115-1, Neff Decl. at ¶ 20; 115-4, Weidhorn Decl. at ¶ 9). Ms. Tolbert also points to paragraph 21 of her declaration, in which she states that she investigated High Noon and found that it had no contact with the City of Indiana Film Office until early 2016. (Doc. 126-11, Tolbert Decl. at ¶ 21).

Ms. Tolbert also argues that High Noon's narrative of how it discovered Ms. Starsiak and Ms. Laine is inconsistent. (Doc. 126 at 25). Ms. Tolbert points to Ms. Seiler's Declaration stating that she discovered the stars of *Good Bones* by doing a Google search for "AChix," that she was looking for a lesbian renovation company, and that she was tasked with finding a new kind of on-screen talent in the "family-based home renovation space." (*Id.* at 26; Doc. 115-2; Seiler Decl.). Ms. Tolbert also points to a March 2014 e-mail from Ms. Neff saying that the *Good Bones* stars were found in an HGTV casting assignment at High Noon. (Docs. 126 at 26; 126-5). Ms. Tolbert then points to a *Reel Screen* article featuring a statement from High Noon co-

37

founder Jim Berger about the show and reporting that High Noon made cold calls in 2015 and found the *Good Bones* stars. (Doc. 126 at 26; 126-16). Ms. Tolbert also points to the Two Chicks and a Hammer website, which states that Ms. Starsiak and Ms. Laine were approached by High Noon in 2014. (*Id.*). Ms. Tolbert lastly points to a list of titles explored by Discovery for *Good Bones* showing that "Like Mother, Like Daughter" is one of 47 titles Discovery considered for the show. (Doc. 126-16).

In response, Discovery points to a Word document titled "2 Chicks & a Hammer Draft Episode Breakdown," attached to a May 8, 2014 email between Patrick Jager, Lindsey Weidhorn, and Katie Neff to show that the pilot episode was in the works in spring 2014. (Docs. 136 at 8; 115-1 at 45).

Discovery argues that Ms. Tolbert submits inadmissible hearsay media reports that misreport the chronology of *Good Bones* development and submits additional declarations from Tina Seiler, Katie Neff, and Jim Berger regarding the show's development. (Docs. 136-5, 136-6, 136-7). Ms. Seiler and Ms. Neff reiterate the timelines set forth in their original declarations, and Mr. Berger states that he did not make the statement attributed to him in the March 21, 2016 article about the *Good Bones* stars being discovered "last year," i.e., 2015, and that the statement is inaccurate. (Doc. 136-7, Berger Decl. at ¶ 3). Mr. Berger further states that he can "state unequivocally" that Ms. Seiler found Ms. Starsiak and Ms. Laine in November 2013 and that it took about a year for the show to be developed—a normal amount of time for a pilot episode of a home renovation TV show. (*Id.* at ¶ 4).

In her surreply, Ms. Tolbert points to a High Noon company policy document that states the production company would meet with talent before filming a pilot. (Doc. 142-1). Ms. Tolbert also asserts that a production company can produce a pilot episode in 6 to 12 weeks. (Doc. 141 at

9). Ms. Tolbert points to a radio interview in which Ms. Starsiak and Ms. Laine state that they were contacted in 2014. But Ms. Tolbert does not submit this interview as record evidence; thus the court does not consider it.

If a defendant produces evidence that it independently created a work, it "can negate the presumption of copying." *Watt*, 457 Fed. App'x at 859. Here, no presumption of copying exists because Ms. Tolbert did not raise a genuine issue of material fact as to whether Discovery had access to Ms. Tolbert's teaser and because Ms. Tolbert's teaser and the allegedly infringing work are not substantially similar.

But even if the presumption existed, the court would find that Ms. Tolbert has not raised a genuine issue of material fact as to Discovery's independent creation of *Good Bones*. Discovery points the court again to the Eleventh Circuit's decision in *Benson*, the case involving the Coca-Cola jingle, to support its claim of independent creation. In that case, the Eleventh Circuit found that testimony of songwriters "constitute[d] uncontradicted evidence of independent creation, fully negating any claim of infringement." *Benson*, 795 F.2d at 975.

Discovery also points the court to *Calhoun v. Lillenas Publ'g*, 298 F.3d 1228 (11th Cir. 2002), another case involving a songwriter. In that case, a songwriter submitted his own affidavit stating that he had created a song during a church service as well as affidavits of witnesses who corroborated his statement. *Id.* at 1233. The plaintiff did not offer evidence contradicting the defendant songwriter's testimony, and the Eleventh Circuit affirmed the district court's ruling that defendant songwriter's independent creation of the song negated the plaintiff's claim of copyright infringement.

Although Ms. Tolbert has pointed to some alleged inconsistencies, she has not pointed to *evidence* showing that a genuine issue of material fact exists as to the independent creation of

39

*Good Bones*. She argues that different employees had different things to say about the timeline of the show's creation and production. But, Ms. Sayles's statement that she was tasked with producing the pilot in September 2014, when she returned to High Noon after a hiatus, is not necessarily inconsistent with other employees stating that <u>they</u> began working on the pilot after it was greenlighted in spring 2014. And Ms. Tolbert's pointing to an article reporting that High Noon discovered the *Good Bones* stars in 2015 is hearsay and inadmissible evidence. Ms. Tolbert has not raised a genuine issue of material fact as to Discovery's independent creation of *Good Bones*. Thus, the court GRANTS Discovery's motion for summary judgment as to Ms. Tolbert's copyright infringement claim on independent creation grounds.

D.  <u>Conclusion</u>

For the reasons explained above, the court **DENIES** Ms. Tolbert's motion to exclude the testimony of Discovery's expert Lars Schou (doc. 134), **GRANTS IN PART** and **DENIES IN PART** Discovery's motion to strike portions of Ms. Tolbert's declaration (doc. 137), and **GRANTS** Discovery's motion for summary judgment (doc. 113) as to Plaintiff's copyright infringement claim, the only remaining claim in this case, on the grounds that Discovery did not have access to Ms. Tolbert's teaser, that the teaser and *Good Bones* are not substantially similar, and that Discovery has shown that High Noon independently created *Good Bones*.

**DONE** and **ORDERED** this 26th day of August, 2021.

_____
**KARON OWEN BOWDRE**
UNITED STATES DISTRICT JUDGE

40